THOMPSON, *Appellant,*
*v.*
COATS, *Respondent.*

547 P2d 92

*Stanley E. Clark,* of Clark & MacMurray, Redmond, argued the cause and filed briefs for appellant.

*James C. VanVoorhees,* Prineville, argued the cause for respondent. James F. Bodie, Bodie, Minturn, VanVoorhees & Larson were on the brief.

Before O'Connell, Chief Justice, and McAllister, Denecke, Tongue, Howell, and Bryson, Justices.

McALLISTER, J.

## McALLISTER, J.

This action for wrongful death was brought against Robert L. Coats, a highway contractor, by Earl Thompson as the personal representative of the estate of his daughter, Kathleen B. Thompson. At the close of plaintiff's case defendant's motion for an involuntary nonsuit was allowed. Plaintiff has appealed. We reverse.

Kathleen B. Thompson died as the result of injuries sustained in an automobile accident on July 26, 1971. The accident occurred on an 11.8 mile stretch of highway in Wasco County which the defendant had just repaved under a contract with the State Highway Commission. The repaving had raised the level of the highway and had left an abrupt drop-off of from five to eight inches on each side of the pavement. Defendant's contract did not include any work on the shoulders of the highway, which were to be built up by the Highway Commission after defendant's paving contract had been completed.

Kathleen was driving her car in a northwesterly direction on the new pavement at a point about a mile or so from the south end of the paving project. It was in the evening and Kathleen was driving toward the setting sun. There was evidence from which the jury could have found that one or both of the right wheels of the decedent's car dropped off the right or east edge of the highway and that the car had then skidded sideways diagonally across the pavement, dropped off the west edge of the pavement, and then rolled over several times and came to rest 171 feet from the west edge of the pavement.

At the time of the accident there was no center line, nor any fog lines painted on the pavement, but there were small florescent squares indicating where the center line would be painted.

The contract between Coats and the Highway Commission consisted of a Contract and Bond for Highway

Construction and a book of Standard Specifications for Highway Construction, both of which contain provisions pertinent to this case. We quote a provision from the Standard Specifications:

"107.18 Public Safety and Convenience — The contractor shall be responsible for all damages to property, injury to persons, and loss, expense, inconvenience, and delay that may be caused by or that may result from any act, omission, or neglect of the contractor, his subcontractors, or the employees of either in the performance of the work to be done under the contract.

\* \* \* \* \*

"Where abrupt dropoffs occur or other hazards are created, the contractor shall provide warning devices visible by day and by night delineating the hazard and warning traffic of its existence."

The Contract contained the following provisions:

"107.27 Temporary Protective and Directional Measures for Traffic — Temporary protection and directional measures for traffic shall be provided in conformance with subsection 107.27 of the Standard Specifications supplemented and/or modified as follows:

\* \* \* \* \*

"e. Reflectorized guide posts shall be installed on approximate 50-foot centers at all locations where there is a hazardous vertical drop-off at the edge of the travel way and/or where construction work affects a ready definition of the edges of the usable travel way. Reflectors shall meet the requirements set forth in subsection 711.03 of the Standard Specifications."

There was ample testimony that the reflectorized guideposts were not in place from the south end of the project to the scene of the accident. In fact, the case seems to have been tried on the tacit understanding that the reflectorized guideposts had never been installed, at least on the south portion of the project where this accident occurred. Pictures taken of the scene of the accident the day after it occurred showed clearly that there were no reflectorized guideposts along either side of the pavement and there was tes-

timony that these pictures were an accurate portrayal of the scene of the accident at the time it occurred.

Defendant's liability, if any, arises from a common law duty to protect the public from any dangerous condition which he may have created in the performance of his contract. *Archer v. Rogers Construction, Inc.,* 252 Or 165, 171, 447 P2d 380 (1968). In *Larson v. Heintz Const. Co. et al,* 219 Or 25, 53, 345 P2d 835 (1959), we held that a highway construction contract, as here, is admissible in evidence as a circumstance to be considered in determining whether reasonable care was exercised.[1] See, also, *Waterway Terminals v. P. S. Lord,* 242 Or 1, 50-51, 406 P2d 556, 13 ALR3d 1 (1965); *Collins v. Lantz, Vickery,* 244 Or 62, 67, 415 P2d 763 (1966). In this case we hold that the contract provisions requiring the installation of reflectorized guideposts along each edge of the pavement were sufficient, together with the other evidence, to make a case for the jury.

Defendant's motion for an involuntary nonsuit was based on five grounds, but the trial court allowed the nonsuit only on the ground that the defendant had, for practical purposes, completed his contract and that control of the project had passed to the Highway Commission.

The pertinent provisions of the contract regarding completion of the contract and acceptance of the work by the Highway Commission are as follows:

"105.01 Authority of the Engineer — * * *

"Approval by the engineer signifies favorable opinion and qualified consent; it does not carry with it certification, nor assurance of completeness nor assurance of quality nor assurance of accuracy concerning details, dimensions and quantities. Such approval will not relieve the contractor from responsibility for errors, for improper fabrication, for nonconformance to requirements, or for deficiencies within his control."

---

[1] The specially concurring opinion, on the other hand, erroneously assumes that the liability of defendant Coats, if any, is based solely on his contract with the State Highway Commission.

"105.18 Semifinal and Final Inspection — Upon due notice in writing from the contractor of presumptive completion of the entire project, the engineer will make a semifinal inspection within ten days of receiving said notice. If at such semifinal inspection, all construction provided for and ordered under the contract is found completed and satisfactory to the engineer, such inspection shall constitute the final inspection.

\* \* \* \* \*

"105.19 Final Acceptance — Final acceptance of the work under the contract is to be by resolution by the Highway Commission and will be subsequent to and contingent upon the final inspection of the work.

"The contractor will be notified in writing, concerning final acceptance of the work, within ten days after Commission action or as soon thereafter as is practicable."

The defendant's primary contention is that "the contractor had been relieved of liability at the time of the accident by the practical acceptance of the pavement work by the State of Oregon through its Resident Engineer Clark."[2]

We disagree with defendant's contention for two reasons. In the first place, it is clear from the evidence that two conditions precedent for acceptance of the work had not occurred. In addition to the preliminary inspection by the resident engineer, it was necessary for the work to be inspected by the regional engineer. This inspection was not completed until July 29, 1971. In addition, the work was not finally accepted by resolution of the Highway Commission until about September 1, 1971.

In allowing the nonsuit the trial court relied on the doctrine of practical completion as stated in the Anno-

---

[2] Defendant also contends that the nonsuit should have been allowed on the grounds (1) that plaintiff's evidence did not show a violation of any duty owed by defendant to the decedent, and (2) that plaintiff's evidence established contributory negligence on the part of the deceased as a matter of law. We think both of these contentions are devoid of merit.

[ 482 ]

tation, Contractor—Liability to Third Person, 13 ALR2d 191, 211, from which we quote:

"The operation of the general rule that the contractor is not liable to a third person receiving injury or damage as a result of the negligent construction of the work, after the completion and acceptance thereof by the contractee or owner, does not require a formal acceptance of the contractor's work, and the liability of the contractor will cease with a practical acceptance after completion."

We question whether the preliminary inspection by the resident engineer can amount to practical acceptance when the resident engineer testified that his preliminary inspection was subject to approval by an inspection made by his superior, the regional engineer. The final inspection was not made until July 29, 1971, or three days after the accident.

In any event, the doctrine of practical acceptance is out of harmony with our cases which have imposed liability on a contractor for damage to third persons caused by the contractor's negligence in the performance of his contract, but occurring after the work had been completed by the contractor and accepted by the owner.

In *Strandholm v. General Const. Co.,* 235 Or 145, 155, 382 P2d 843 (1963), we said:

"It is now the generally accepted view that the liability of a contractor is the same as that specifically imposed upon a manufacturer by MacPherson v. Buick Motor Co., supra, 217 N. Y. 382, 111 N. E. 1050, LRA 1916F, 696. Study of the MacPherson opinion causes wonder that there could have been so much question as to the application of the doctrine announced by the Mac-Pherson case to persons who were not manufacturers in the strict sense of the word. * * *"

We further said, at page 157:

"In any event a person standing in the position of defendant in the instant case [a construction company which had installed a mast, boom and rigging for an injured longshoreman's employer] is now generally held

[ 483 ]

to a liability for injury caused to third persons by his failure to safely build or manufacture. * * *"

In *American Insurers v. Bessonette,* 235 Or 507, 384 P2d 223, 385 P2d 759 (1963), we applied the rule adopted in *Strandholm* to a case in which the defendant construction company had negligently constructed a concrete wall of a building so as to cause a main sprinkler pipe to break after the building had been completed and accepted. We held that the completion and acceptance of the building did not relieve the construction company from liability to the owner of groceries stored in the building which were damaged by water escaping from the broken sprinkler pipe.

The modern view is well expressed in the following quotation from 41 Am Jur 2d 824, Independent Contractors §50:

> "While pointing out that the primary vehicle for the general trend away from nonliability of a contractor for negligence under the 'accepted work' doctrine has been a group of well-established exceptions, some courts have taken the 'modern' view that the simpler approach lies with the outright repudiation of the 'accepted work' doctrine of nonliability and the adoption of a doctrine which recognizes that liability should issue from negligence in the face of danger to others that may be reasonably foreseen; that in the interest of clarity in the statement of the law, the court should not concern itself with exceptions which, as in cases of products liability, have largely emasculated the general rule; and that acceptance of defective work should not be a legal excuse for the negligent performance of that work, nor for leaving premises in a dangerous condition. It was pointed out, however, that rejection of the 'accepted work' doctrine is not an imposition of absolute liability on contractors, but simply a rejection of the notion that although a contractor is found to have performed negligent work or left premises in an unsafe condition and such action or negligence is found to be a proximate cause of injury, he must nevertheless be held immune from liability solely because his work has been completed and accepted in an unsafe condition."

See, also, *Dow v. Holly Manufacturing Company,* 49 Cal2d 720, 321 P2d 736 (1958); *Hanna v. Fletcher,* 97 App DC 310, 231F2d 469, 58 ALR2d 847, cert den 351 US 989, 76 S Ct 1051, 100 L ed 1501 (1956).

We also quote from Prosser on Torts (4th ed) 681, §104:

> "As in the case of the seller of chattels, the exceptions tended gradually to swallow up the prevailing rule, until the analogy of MacPherson v. Buick Motor Co. was persuasive, and was finally accepted. It is now the almost universal rule that the contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him, but also when the work is negligently done. * * *"

In this case the resident engineer testified that there were several signs posted by defendant at the south end of the project. These included, first, a sign identifying the contractor, next, a flasher sign reading "ROAD CONSTRUCTION AHEAD", next, a sign reading "SLOW", next, a sign reading "CONSTRUCTION SPEED 40", and, lastly, a sign reading "ABRUPT PAVEMENT EDGE". According to the resident engineer it was nine-tenths of a mile from the last sign to the scene of the accident.

The resident engineer further testified that when he inspected the project on July 23rd he requested the defendant to leave the signs in place "until after we had made our final inspection." The jury could have inferred that if the reflectorized guideposts had been installed as required by the contract that the engineer would have requested that the guideposts also be left in place.

But whether the engineer would have made such a request is not conclusive. The jury could, nevertheless, find that the contractor owed travelers a duty, both to install the guideposts and to leave them in place until the dangerous condition had been eliminated by the buildup of the shoulders to the pavement level. The

jury could also have inferred that if the guideposts had been installed and left in place "delineating the hazard" Kathleen Thompson would not have driven so close to the east edge of the pavement that her right wheels dropped off the abrupt edge, causing her death.

We find that the court erred in allowing defendant's motion for a nonsuit and the case is reversed and remanded for a new trial.

**DENECKE, J.,** specially concurring.

I concur that the trial court erred. It was at least a question for the jury whether at the time of death the state had assumed responsibility for placing warnings of the drop-off and, if not, whether the defendant was negligent in failing to reasonably warn of the drop-off.

I do not join in the majority, however, because I am of the opinion that the principle stated in *Strandholm v. General Const. Co.,* 235 Or 145, 382 P2d 843 (1963), is inapplicable.

In *Strandholm v. General Const. Co.,* supra (235 Or at 158), we held the defendant liable for negligently constructing a boom which it rebuilt for the plaintiff's employer, Dreyfus. About six months after Dreyfus had accepted the work the boom injured plaintiff. We rejected the rule that acceptance of the work ended the defendant's liability for negligent construction. We quoted from Harper and James that the rule of nonliability was an " 'offspring of the privity rule and the last-wrongdoer rule.' " 235 Or at 158. For this reason we also rejected the argument that Dreyfus's negligence was an intervening cause which terminated the defendant's liability.

*American Insurers v. Bessonette,* 235 Or 507, 384 P2d 223, 385 P2d 759 (1963), extended the principle of *Strandholm* to building contractors. The defendant builder " 'caused a concrete wall to be constructed so as to cause a main sprinkler pipe to break after the building had been completed and accepted.' " 235 Or at 508.

[ 486 ]

In neither case was there merely a "practical acceptance." Dreyfus, in *Strandholm,* and the owner of the premises in *Bessonette,* fully and finally accepted the work. The principle of *Strandholm* and *Bessonette* is that a negligent contractor or builder will be responsible for an injury occuring long after the work is completed and accepted if the builder's negligence caused the injury. We applied the *Strandholm* principle in *Tucker v. Unit Crane & Shovel Corp.,* 256 Or 318, 473 P2d 862 (1970), and held a manufacturer liable for an injury occurring nine years after the crane was manufactured and accepted.

I joined the majority opinions in *Strandholm* and *Bessonette* and believe they are clearly correct. I do not believe, however, that they are applicable to the present facts.

The rule we adopted in *Strandholm* was not based upon contract. We held the duty of the builder to build a reasonably safe product was not terminated by acceptance of the product by Dreyfus. While we did not expressly so state, I believe it logically follows that Dreyfus could not limit defendant's liability by contracting that upon Dreyfus's acceptance of the work the defendant would no longer be liable to subsequently injured third parties. Such a contract might create a right in defendant to be indemnified by Dreyfus; however, it could not bar defendant's liability to third parties.

I view the relationship of the defendant road contractor, the Highway Commission and users of the highway to be different than the relationships in *Strandholm* and *Bessonette.* The period when the defendant contractor was to be responsible for warning motorists was fixed by the contract with the Commission. I can think of no reason why such a contractual provision should not be honored and should not under usual circumstances govern the contractor's liability to third persons. For example, if the contract between the Highway Commission and the contractor

provided that the state would at all times assume full responsibility for furnishing warnings of the drop-off, I am of the opinion that the contractor would not be liable to a motorist who was injured because of inadequate warnings.

A land possessor such as the State Highway Commission has a duty to maintain land in a reasonably safe condition. I know of no reason, however, why the landowner should not have the power to direct a contractor what it may and may not do on its land, and when.

I view the question raised by this case to be, when did the contractor's duty to warn, including the erection and maintenance of reflectors, terminate? The plaintiff similarly viewed the question:

> "In the case at bar, there are two entities who might potentially have been in control of the work area at the time of Plaintiff's decedent's accident — the State of Oregon and the Defendant. Those two entities had contracted to place the responsibility for the work area and for safety measures therein on the contractor until final acceptance by the Highway Commission. * * *."

The two decisions on which plaintiff principally relied also regard the problem in the same light.

In *Soden v. Bennett,* 173 Kan 142, 244 P2d 1204 (1952), the defendant contractor rebuilt a road with black top pavement and soft shoulders on the edges. The charge was that the decedent was killed because the contractor failed to adequately warn of the soft shoulders. The contract provided that the contractor was to provide warnings. It further provided: "The contractor's responsibilities for the maintenance of barricades and lights on any individual item of work included in the contract shall cease only when released in writing by the engineer." 173 Kan at 147.

The court held:

> "Once it is determined appellant's liability under the contract did not cease until the job in question was accepted by the board of county commissioners we have

little difficulty, after reviewing the facts of the record to which we have heretofore referred, in determining that the trial court did not err in overruling appellant's [contractor] demurrer to the evidence or his motion for a directed verdict. * * *." 173 Kan at 150.

*Breslin v. Fredrickson,* 152 Cal App2d 780, 313 P2d 597 (1957), was a similar case. The court held:

"* * * [W]e think it must and should be held that where the contractor in his contract accepts responsibility for the condition of a public road as made or left by the performance of his contract until a certain type of release has been effected such liability continues and persons injured by defective conditions of the road during such a period may recover against the contractor. * * *." 152 Cal App2d at 788.

As initially stated, I concur in the majority's decision to reverse because it was at least a question of fact whether the defendant's responsibility as fixed by the contract ceased.

O'CONNELL, C.J., joins in this specially concurring opinion.